# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### NORTHERN DIVISION

ROXANNE L. JOHNSON,       )
                                   )
               Plaintiff,       )
                                   )
                v.             )         No. 2:13 CV 55 DDN
                                   )
CAROLYN W. COLVIN,       )
Acting Commissioner of Social Security,    )
                                   )
              Defendant.     )

## MEMORANDUM

This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security denying the application of plaintiff Roxanne L. Johnson for supplemental security income under Title XVI of Social Security Act, 42 U.S.C. §§ 1381, et seq. The parties have consented to the exercise of plenary authority by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). (Doc. 9.) For the reasons set forth below, the decision of the Administrative Law Judge is affirmed.

## I.  BACKGROUND

Plaintiff Roxanne L. Johnson, born October 28, 1968, filed an application for Title XVI benefits on August 20, 2009. (Tr. 269-71.) She alleged an onset date of disability of December 26, 2008, later amended to June 1, 2009, due to back injury, diabetes, polysubstance abuse, bipolar disorder, and asthma. (Tr. 301, 395.) Plaintiff's applications were denied initially on December 16, 2009, and she requested a hearing before an ALJ. (Tr. 157-67.)

On July 26, 2010, following a hearing, the ALJ found plaintiff not disabled. (Tr. 130-49.) On December 12, 2011, the Appeals Council remanded the case to the ALJ for further development of the record. (Tr. 152-55.) On June 8, 2012, following another hearing, the ALJ found plaintiff not disabled. (Tr. 9-21.) On April 23, 2013, the Appeals Council denied plaintiff's request for review, and she has now appealed to the district court. (Tr. 1-3.) Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## II. MEDICAL HISTORY

On March 20, 2000, plaintiff arrived at Northwest Missouri Psychiatric Rehabilitation Center pursuant to a court order for a mental examination. Plaintiff had been charged with driving while intoxicated. On December 8, 1999, she was arrested after a high speed chase, had consumed five or six drinks, and was on probation for a previous driving while intoxicated offense. She reported the following. She began using alcohol at age sixteen and drank daily for about four years. She can drink two cases of beer per day. She has experimented with marijuana, cocaine, and methamphetamines. She received a diagnosis of bipolar disorder at age twenty-one after her admission to Spellman St. Luke's Hospital. She was admitted to the hospital again at age twenty-four and has received outpatient treatment for the past two years at the Tri-County Mental Health Center. She left school after the eleventh grade but obtained her GED. She cannot bear children due to a rape at age thirteen. She married in 1996 but divorced her spouse last year. She has worked at Shoney's since leaving school and currently works as a manager. She receives food stamps and has applied for disability benefits. (Tr. 664-67.)

Rintu Khan, M.D., described her as demanding and intrusive with her peers and staff as evidenced by plaintiff's written complaints but observed a significant decrease in mania and mood swings. Dr. Candace Munson found plaintiff competent to stand trial and Platte County Detention Center returned her to jail to await her court hearing on April 28, 2000. Dr. Khan diagnosed bipolar I disorder and polysubstance dependence in remission and assessed a GAF of 60.[1] He prescribed Zyprexa, Buspar, Klonopin, and Neurontin to control symptoms of mania, anxiety, and mood swings.[2] (Id.)

---

[1] A GAF score helps summarize a patient's overall ability to function. A GAF score has two components. The first component covers symptom severity and the second component covers functioning. A patient's GAF score represents the worst of the two components.

On the GAF scale, a score from 51 to 60 represents moderate symptoms (such as flat affect and circumstantial speech, occasional panic attacks), or moderate difficulty in social, occupational, or school functioning (such as few friends, conflicts with peers or co-workers). American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32–34 (4th ed. 2000) ("DSM ").

[2] Zyprexa is used to treat certain mental or mood conditions. WebMD, http://www.webmd.com/drugs (last visited on April 30, 2014). Buspar is used to treat anxiety. Id. Klonopin and Neurontin are used to prevent and control seizures. Id.

On October 25, 2006, plaintiff complained of a painful, stiff neck that lasted for one week. She received an assessment of muscle spasm and prescriptions for cyclobenzaprine, Medrol, and ibuprofen.[3] (Tr. 602.)

On April 8, 2007, plaintiff received an assessment of type II diabetes and hyperlipidemia. (Tr. 604.)

On September 24, 2007, plaintiff underwent a laparotomy and resection of pelvic mass due to fertility concerns and abdominal pain.[4] She reported a rape at age thirteen, that she worked as a loader for a Tyson chicken plant, and was widowed. She also reported that she smoked half a pack of cigarettes per day. Her medications included Metformin, Vytorin, Prozac, and albuterol.[5] Sara Crowder, M.D., assessed an enlarged adnexa and advised a total hysterectomy and salpingoophorectomy. (Tr. 605-07.)

On December 19, 2007, plaintiff received normal tympanometry results.[6] (Tr. 485.)

On January 21, 2008, plaintiff reported that she received a partial hysterectomy, could not work, and was evicted. She further reported that she filed for unemployment benefits and sued Tyson, her former employer, because it did not allow her to return to work with lifting restrictions. She reported that her difficulties stemmed from her release from prison in April 2006. She also reported that she worked but struggled to pay her bills. She complained that she could not sleep despite taking trazodone and that Elavil improved her sleep and anxiety.[7] Fernando Perez, M.D., observed anxiety and tearfulness. He diagnosed major depressive disorder

---

[3] Cyclobenzaprine is used short-term to treat muscle spasms. WebMD, http://www.webmd.com/drugs (last visited on April 30, 2014). Medrol is a corticosteroid hormone that decreases the immune system's response to reduce symptoms including swelling and pain. Id.

[4] Laparotomy is an incision into the loin. Stedman's Medical Dictionary 1048 (28th ed., Lippincott Williams & Wilkins 2006) (Stedman).

[5] Metformin is used to control high blood sugar. WebMD, http://www.webmd.com/drugs (last visited on April 30, 2014). Vytorin is used to lower bad cholesterol and fats and raise good cholesterol. Id. Prozac is an antidepressant. Id. Albuterol is used to treat asthma. Id.

[6] Tympanometry measures the airflow of the middle ear at varying levels of air pressure. Stedman at 2058.

[7] Trazodone and Elavil are used to treat mental or mood disorders. WebMD, http://www.webmd.com/drugs (last visited on April 30, 2014).

and posttraumatic stress disorder. He discontinued trazodone, prescribed Elavil, and continued Neurontin, Prozac, and Vistaril.[8] (Tr. 669.)

On February 26, 2008, plaintiff denied depression but complained of racing thoughts. She expressed anxiety but happiness about living with her boyfriend. Dr. Perez observed a happy affect, laughter, and a good sense of humor. (Tr. 670.)

On May 12, 2008, plaintiff reported moodiness and hyperactivity. Dr. Perez described her as hyper, energetic, and hypersexual, and observed frequent laughter. She reported that she tested positive for marijuana use and had a court date. He diagnosed bipolar disorder and post-traumatic stress disorder, increased her dosage of Neurontin and decreased her dosage of Prozac. (Tr. 671.)

On August 19, 2008, plaintiff complained of an unstable, snappy mood. Dr. Perez described her as very talkative and energetic and observed abrupt laughter. He discussed his concern that her dosage of antidepressants overstimulated her. He increased her dosage of Neurontin and decreased her dosage of Prozac. (Tr. 672.)

On December 29, 2008, plaintiff complained of injuring herself at work by lifting an 86 pound box two days earlier. She described the pain as originating in the lower back and radiating to her legs. Raymond Wilbers, M.D., observed her in the office crying, screaming, and favoring her left hip. He assessed lumbosacral muscle spasm and prescribed Toradol, Phenergan, and Soma.[9] (Tr. 489, 491.)

On December 30, 2008, plaintiff reported that she slept well. She discussed verbal abuse from her boyfriend that resulted in the police arriving at her home. Dr. Wilbers informed her of the need to obtain statements from those who witnessed her injury at work. He observed that she used a cane to walk and recommended physical therapy. He noted that she responded well on pain medications and muscle relaxers. He gave her employer instructions that she could perform only sitting work. (Tr. 500.)

On December 31, 2008, plaintiff received an initial evaluation for physical therapy. (Tr. 492.)

_____

[8] Vistaril is used to treat allergic reactions. WebMD, http://www.webmd.com/drugs (last visited on April 30, 2014).

[9] Toradol is used to treat moderate to severe pain. WebMD, http://www.webmd.com/drugs (last visited on April 30, 2014). Phenergan is used to treat nausea, vomiting, allergy symptoms, and as a sedative. Id. Soma is used to treat muscle pain and discomfort. Id.

On January 2, 2009, plaintiff arrived at the emergency room, complaining of a back injury. Lumbar X-rays revealed a probable paraspinal muscle spasm. The impression was acute low back pain. (Tr. 493, 508-19.)

On February 6, 2009, plaintiff complained of wrist swelling and pain. Dr. Schultz assessed right wrist sprain and opined that it would heal without complication and that she could return to work without restrictions to her wrist. She also complained of continued back pain and frustration regarding pain and medication. She stated that prolonged sitting and standing exacerbated the pain. Dr. Schultz observed discomfort in the supine position. He opined that muscle spasm primarily caused the pain and that muscle spasm pain typically resolved within six to twelve weeks. He recommended extra strength Tylenol and a home exercise program. He restricted her from repetitive stooping and twisting and lifting more than 25 pounds but opined that her condition had progressed well and would fully resolve itself. (Tr. 593-95.)

On February 8, 2009, plaintiff complained of coughing blood. She received an assessment of diabetes mellitus II, gastroesophageal reflux disease, and herniated disc and prescriptions. (Tr. 603.)

From February 12 to February 25, 2009, plaintiff attended five therapy sessions. She complained of continued pain but, during the last session, reported that she could walk more. (Tr. 559, 561.)

On March 12, 2009, plaintiff complained of allergies. Michael T. Rothermich, M.D., assessed allergic rhinitis and prescribed loratadine and Flonase.[10] (Tr. 532.)

On March 13, 2009, plaintiff reported steady progress with physical therapy and that an epidural injection received in February improved her pain. She continued to complain of right sacroiliac joint pain that occasionally radiated to her leg and foot but reported resolution of her right wrist injury. X-rays of the pelvis revealed normal sacroiliac joint, sacrum, and pelvis, minimal narrowing at the left femoral acetabular joint, and circular calcifications in the pelvis. Dr. Schultz assessed right sacroiliac joint irritation and improved low back pain with muscle spasm. He also assessed L5-S1 disc bulge, canal stenosis, and minimal foraminal narrowing,

---

[10] Loratadine is an antihistamine that treats allergy symptoms. WebMD, http://www.webmd.com/drugs (last visited on April 30, 2014). Flonase is used to treat allergy symptoms. Id.

which he found nearly asymptomatic.[11]  He ordered a fluoroscopic guided sacroiliac joint cortisone injection.  He restricted her to lifting forty pounds and opined that she would achieve maximum medical improvement by May.  (Tr. 525, 592.)

Also on March 13, 2009, Todd Critchfield, PT, reported that the injection provided relief but that she continued to suffer pain with stationary bike riding, sitting, standing, walking, and lying.  He opined that she would achieve the full range of motion and improved trunk strength and lumbar stabilization.  He also noted the difficulty in progressing her exercise program due to her pain in several positions.  (Tr. 560.)

From March 13 to March 27, 2009, plaintiff attended three physical therapy sessions but missed one.  She reported more soreness due to her forklift use at work.  (Tr. 551, 555.)

On April 2, 2009, physical therapist Critchfield reported that plaintiff complained that her low back pain increased after her return to work and became severe near the end of her shifts.  He noted that she did not significantly improve since her last physician appointment.  (Tr. 557.)

On April 3, 2009, plaintiff complained that after two days of forklift operation at work, her low back pain returned.  Dr. Schultz observed frequent cries, which plaintiff attributed to shooting pains.  He assessed right sacroiliac joint irritation and L5-S1 disc bulge, canal stenosis, and minimal foraminal narrowing and found the sacroiliac joint irritation to be the source of her pain.  He recommended further physical therapy and restricted her from lifting more than 25 pounds, driving machinery, and repetitive stooping, twisting, and bending.  He prescribed meloxicam and set her maximum medical improvement date for June.[12]  (Tr. 591.)

From April 8 to May 9, 2009, plaintiff attended ten physical therapy sessions but missed two.  On April 10, 2009, she could not perform exercises due to pain.  On April 15, 2009, she complained that a twelve-hour shift at work caused her increasingly severe pain.  On April 29, 2009, plaintiff complained that her pain had not improved.  On May 5, 2009, plaintiff appeared

---

[11] The human spinal column consists of thirty-three vertebrae. There are seven cervical vertebrae (denoted C1–C7), twelve thoracic vertebrae (denoted T1–T12), five lumbar vertebrae (denoted L1–L5), five sacral vertebrae (denoted S1–S5 and fused together into one bone, the sacrum), and four coccygeal vertebrae (fused together into one bone, the coccyx). The cervical vertebrae form part of the neck, while the lumbar vertebrae form part of the lower back. The sacrum is immediately below the lumbar vertebrae. Stedman at 226, 831, 1376, 1549, 1710, Plate 2.

[12] Meloxicam is used to treat arthritis.  WebMD, http://www.webmd.com/drugs (last visited on April 30, 2014).

very emotional throughout the sessions.  On May 8, 2009, plaintiff complained that her pain had not improved but that she returned to work.  Physical therapist Critchfield found no significant improvement during this time and opined that the twelve-hour shifts increased her pain.  (Tr. 551, 553, 555-56.)

On April 12, 2009, plaintiff complained of neck pain and asthma.  Dr. Rothermich assessed asthma, allergies, hyperlipidemia, and mild neck muscle spasm.  (Tr. 531.)

On May 12, 2009, plaintiff complained of low back pain that radiated to her left leg.  John D. Miles, M.D., noted that conservative treatment, including physical therapy, injections, and muscle relaxants, provided minimal relief.  She complained that walking, squatting, bending, and twisting exacerbated her pain.  Dr. Miles assessed spondylosis at S5-L1 with bulging disc but described plaintiff as histrionic.  He requested a lumbar MRI scan and a nerve study for her right leg.  He also restricted her from lifting more than 25 pounds, repetitive bending, twisting, stooping, and prolonged sitting or standing.  He opined that she could walk a quarter  mile.  (Tr. 589-90.)

On June 2, 2009, plaintiff complained of low back pain and reported that her employer terminated her.  Lumbar MRIs revealed minimal spinal canal stenosis at L3-L4, mild spinal canal stenosis and mild neuroforaminal narrowing at L4-L5, small central disc protrusion, mild spinal canal stenosis, and mild neuroforaminal narrowing at L5-S1.  A nerve conduction study of her right leg revealed no abnormalities.  The impression of Dr. Miles was acute annular tear and discogenic low back pain.  He recommended a discogram and continued her work restrictions.[13] (Tr. 583-87.)

On June 30, 2009, plaintiff arrived at a pain clinic, complaining of low back pain and intermittent right leg pain.  She underwent a discogram, which revealed left paracentral annular tear with posterior disc protrusion and discordant pain at L3-4, concordant back pain at L4-5, and mild degenerative disc disease at L5-S1.  Richard Wolkowitz, M.D., prescribed Vicodin.  (Tr. 567-72.)

On July 19, 2009, plaintiff complained of low back pain.  Dr. Miles observed tearfulness and denied her as a candidate for surgery, noting her emotional issues as the overriding factor.  He

_____

[13] A discogram is the radiographic record of an intervertebral disc with the injection of contrast media.  Stedman at 550.

found her to be at maximum medical improvement but placed her under no permanent work restrictions. He further opined that her work injury caused permanent partial disability. (Tr. 577.)

On August 26, 2009, plaintiff received an assessment of diabetes mellitus II, bipolar disorder, herniated disc, and gastroesophageal reflux disease. (Tr. 601.)

On November 4, 2009, David Peaco, Ph.D., performed a psychological evaluation on plaintiff. Plaintiff reported the following. She left school after the tenth grade but obtained her GED. She has not worked since May 2009 but previously worked as a forklift operator in a factory for three years. In December 2008, she injured her back. She spent six years in prison due to her fourth DWI offense. She suffers from back pain, diabetes, asthma, and high cholesterol. She was first hospitalized for mental health problems at age fourteen for anxiety and depression and has since been hospitalized three or four times. She was last hospitalized in 1999. Her psychiatric medications include gabapentin, amitriptyline, and lorazepam.[14] She began abusing alcohol in high school and continued until two years ago. She participated in two alcohol treatment programs. She currently drinks about twelve drinks per month. She lives with her boyfriend of two years and his seventeen-year-old daughter. Her first marriage ended in divorce in 1999, and her second marriage ended with the death of her spouse in 2002. (Tr. 616-18.)

Dr. Peaco observed a very unsteady gait, use of a cane, and that plaintiff walked with her upper torso bent to one side. He noted excessive talking and loud voice and laughter. He observed inappropriate and extremely intense affect and irritable and depressed mood. He found that she suffered a manic episode during the interview. She reported that she cannot perform many household chores, including sweeping, mopping, or cleaning the cat box. She can cook, wash dishes, and perform personal hygiene tasks, except that she requires some assistance dressing. She requires frequent breaks throughout the day. Her social life is very limited. Dr. Peaco found her persistence in performing tasks severely impaired, her pace to be slow, and her concentration to be moderately impaired. Her driver's license was revoked in 2000 due to a DWI offense. She reported that she was charged with another driving offense at the time of the evaluation. (Id.)

---

[14] Gapapentin is also known as Neurontin. WebMD, http://www.webmd.com/drugs (last visited on April 30, 2014). Amitriptyline is also known as Elavil. Id. Lorazepam is used to treat anxiety. Id.

Dr. Peaco's impression was bipolar disorder, and he assessed a GAF of 55. He found that she could understand and remember simple instructions. He further found her social functioning mildly impaired and her ability to function with her surroundings to be severely impaired due to bipolar disorder and other health problems. (Id.)

On November 25, 2009, David B. Robson, M.D., performed a medical evaluation on plaintiff. She complained of low back and right paralumbar pain. She reported the following. Physical therapy did not improve her condition. Epidural injections did not provide long-term pain relief. Sitting, standing, walking, damp weather, twisting, stress, sex, cold weather, bending, coughing, sneezing, and working exacerbate her pain. Laying down, heat, massages, medications, and ice relieve the pain. She can perform daily living activities, except for climbing stairs, housework, yard work, and working at her job. (Tr. 622-25.)

Her medications include pravastatin, metformin, Ventolin, Zantac, clobenzaprine, gabapentin, lorazepam, amitriptyline, fluoxetine, and hydroxypam.[15] She smokes a half pack of cigarettes per day. She measured five feet, three inches, and 162 pounds. Dr. Robson diagnosed low back pain and opined that she had obtained maximum medical improvement and that she would not benefit from surgery. He noted that her December 2008 injury caused the disc bulge and annular tear at the L5-S1 level. (Id.)

On December 2, 2009, Mark Altomari, Ph.D., submitted a Psychiatric Review Technique regarding plaintiff. He found that she had the medically determinable impairment of bipolar disorder. He also found that she suffered moderate restrictions with daily living activities, social functioning, and concentration, persistence, and pace. (Tr. 640-51.)

On December 2, 2009, Dr. Altomari also submitted a Mental Residual Functional Capacity Assessment regarding plaintiff. He found that plaintiff had moderate limitations with the ability to maintain regular attendance in a punctual manner and the ability to work in coordination or near others without distraction. He further found that she had moderate limitations with the ability to interact appropriately with the general public, the ability to interact with supervisors, the ability to interact with coworkers without distraction or behavioral extremes,

---

[15] Pravastin is used to lower bad cholesterol and fats and raise good cholesterol. WebMD, http://www.webmd.com/drugs (last visited on April 30, 2014). Ventolin is used to treat asthma. Id. Zantac is used to treat heartburn. Id. Fluoxetine is also known as Prozac. Id. Hydroxyzine pamoate is used to treat itching caused by allergies. Id.

and the ability to maintain socially appropriate behavior. Additionally, he found that she had moderate limitations with the ability to respond appropriately to changes in the work setting. (Tr. 652-54.)

On December 16, 2009, Jan Harcourt submitted a Physical Residual Functional Capacity Assessment regarding plaintiff. She found that plaintiff could only occasionally lift twenty pounds, frequently lift ten pounds, stand and walk about six hours in an eight-hour workday, and sit for about six hours. She further found that plaintiff could only occasionally climb ramps and stairs, and kneel; and could never climb ladders, ropes, or scaffolds. Additionally, she found that plaintiff should avoid concentrated exposures to extreme cold and fumes, odors, dusts, gases, and poor ventilation. (Tr. 655-62.)

On April 27, 2010, plaintiff complained of low back pain and leg pain, numbness, and weakness. She reported that she stopped smoking cigarettes two months ago and drank one to two beers per month. She further reported that she resided with a friend. Prudence Baugher, P.A., diagnosed bipolar disorder with disc protrusion, lateral recess stenosis, and bony foraminal stenosis at L5-S1. She scheduled plaintiff for L5-S1 anterior lumbar interbody fusion with unilateral posterior spinal fusion. (Tr. 676-78.)

On May 12, 2010, plaintiff underwent an anterior lumbar interbody fusion at L5-S1. She tolerated the procedure well. She reported that personal issues left her without a place to go following the procedure, but social work assisted her. On May 17, 2010, Craig A. Kuhns, M.D., discharged plaintiff. (Tr. 679-86.)

On May 20, 2010, plaintiff complained of pain. Sarmistha Bhalla, M.D., observed plaintiff crying and noted that her history could not be taken due to her condition. He renewed her medications and rescheduled the psychiatric evaluation. (Tr. 674.)

On June 10, 2010, plaintiff complained of incapacitating right lower abdominal pain. A CT scan of the lumbar spine revealed that the instrumentation from the surgical procedure remained in place. Dr. Kuhns found no issues with the procedure and no infection but prescribed Vicodin. (Tr. 896-97.)

On June 14, 2010, plaintiff complained of abdominal wall pain and constipation. Bruce E. Brown, M.D., noted that her recovery had progressed well. (Tr. 847.)

On June 26, 2010, plaintiff arrived at the emergency room, complaining of chronic right abdominal pain, and requested pain medication. Laura Kimberly Gonzalez, M.D., indicated that plaintiff screamed at her, but that her labs and CT scans revealed no abnormalities. Plaintiff suspected that Dr. Gonzalez implied that she fabricated her complaints of pain. Dr. Gonzalez refused to prescribe pain medication and diagnosed abdominal pain. (Tr. 827-46.)

On August 19, 2010, plaintiff complained of continued pain. She reported physical altercations with her significant other and that she planned on moving. Dr. Kuhns found her incisions well-healed and that the instrumentation remained in place. (Tr. 888.)

On September 4, 2010, plaintiff arrived at the emergency room unresponsive and suffered ventilator-dependent respiratory failure due to multiple drug overdose, including amitriptyline. Drug screening indicated use of amphetamine, benzodiazepine, alcohol, and marijuana. She consulted with a psychiatric therapist who deemed her mentally labile and incompetent to make independent decisions. Eugene Thomas, D.O., transferred plaintiff for inpatient psychiatric evaluation and treatment. (Tr. 716-34.)

On September 4, 2010, plaintiff was involuntarily committed to the University of Missouri Health Care. According to the commitment papers, the following occurred. On August 29, 2010, a women's shelter evicted her, and she returned to her boyfriend's home. On September 2, 2010, she argued with her boyfriend and overdosed on alcohol, Elavil, and Neurontin. She denied a suicide attempt, explaining that she consumed the drugs to calm down. During her admission, plaintiff complied with her prescriptions. The impression of Henry W. David, M.D., was moderate, recurrent major depressive disorder, cannabis abuse, and bipolar disorder. He assessed a GAF score of 30.[16] Richard Bowers, D.O., observed improvement with her mood, affect, and depression. Near the end of her stay, plaintiff reported that she felt better, and Dr. Bowers observed bright affect and social interactions. Plaintiff reported her plan to reside with a friend. On September 8, 2010, Dr. Bowers discharged plaintiff. (Tr. 736-46.)

On September 28, 2010, plaintiff recounted the events leading to her overdose to Dr. Bhalla. She further reported that a warrant had issued for her arrest due to missing a court date. (Tr. 1015.)

---

[16] On the GAF scale, a score from 21–30 indicates behavior that is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment or inability to function in almost all areas. DSM at 32-34.

On November 16, 2010, plaintiff complained of right chest wall and low back pain. She reported that she was in jail for a DUI. Dr. Kuhns that the instrumentation maintained its alignment and prescribed Flexeril. (Tr. 884-85.)

On January 19, 2011, plaintiff arrived at the emergency room, complaining of low back pain. She reported that she fell in jail two weeks earlier. X-rays of the sacrum and coccyx revealed interval spinal fusion at the lumbosacral junction but no other abnormalities. X-rays of the lumbar spine revealed interval postoperative changes of the lumbosacral junction and possible development of rotary levoscoliosis. (Tr. 772-83.)

On January 31, 2011, the Family Counseling Center of Missouri admitted plaintiff due to drunk driving. She reported that she worked as a waitress, in management, at a greenhouse, and at a sewing factory, and could perform welding, carpentry and construction. She reported five DWI convictions and that she awaited trial on her sixth DWI. She completed residential treatment on March 9, 2011, and was moved to intensive outpatient treatment. However, plaintiff did not complete the treatment due to moving to another town. (Tr. 920-42.)

On February 3, 2011, plaintiff arrived at the emergency room, complaining of tooth pain and continued back and hip pain. Lumbosacral X-rays revealed postoperative changes but no other abnormalities. The impression of Cynthia Ruffalo, M.D., was acute low back pain and unspecified disorder of the teeth. (Tr. 819-26.)

On February 18, 2011, plaintiff arrived at urgent care, complaining of low back pain that radiated to both legs. The impression of Phu Tran, M.D., was low back pain, and plaintiff received prescriptions of Ultram, Skelaxin, Keflex, and ibuprofen.[17] (Tr. 814-18.)

On March 1, 2011, plaintiff reported back pain that radiated to her left leg and hips and numbness in the left chest wall. Dr. Kuhns indicated that a physical altercation and fall increased her pain. He scheduled an L4-L5 interlaminar epidural steroid injection. (Tr. 856-57.)

On March 20, 2011, plaintiff arrived at the emergency room, complaining of increased back pain and dental pain. She reported that she could not obtain the epidural injection due to the

---

[17]   Ultram is used to relieve moderate to moderately severe pain. WebMD, http://www.webmd.com/drugs (last visited on April 30, 2014). Skelaxin is used to treat muscle spasms and pain. Id. Keflex is an antibiotic. Id.

expiration of Medicaid. The impression of John Yanos, M.D., was low back pain and dental pain. (Tr. 800-13.)

On March 25, 2011, plaintiff reported that she resided at a battered women's shelter and attended alcohol recovery classes. She lost Medicaid coverage, which prevented her from meeting with a psychiatrist, but she intended to reapply. Her medications included Advair, albuterol, amitriptyline, Combivent, flexeril, fluoxetine, gabapentin, ibuprofen, metformin, ranitidine, simvastatin, and tramadol.[18] Timothy Joseph Hayes, M.D., assessed chronic obstructive pulmonary disease, diabetes mellitus, gastroesophageal reflux disease, bipolar disorder, and back pain. He prescribed lovastatin.[19] (Tr. 864-68.)

On April 12, 2011, plaintiff reported increasing back pain and depression. He opined that her surgery had not completely healed and that she might have adjacent segment disease. He scheduled her for an L4-5 interlaminar epidural steroid injection. (Tr. 879-80.)

On May 2, 2011, plaintiff complained of chronic low back pain that radiated to the left leg and left arm numbness, tingling, and stabbing pain. She reported that standing, sitting, walking, lying, lifting, carrying, bending, sneezing, and riding in a car exacerbated her back pain. David Lancaster, D.O., assessed lumbar radiculopathy. He opined that she could perform no labor intensive work or work that requires prolonged standing, sitting, walking, lifting, or bending. (Tr. 908-10.)

On May 31, 2011, plaintiff arrived at the emergency room, complaining of back pain. The impression of Kim Rettenmaier, M.D., was acute low back pain, abdominal pain, and sciatica. Dr. Rettenmaier prescribed Percocet, magnesium citrate, Zofran, and Dilaudid.[20] CT scans of the

---

[18] Advair and Combivent are used to treat the symptoms of asthma or ongoing lung disease. WebMD, http://www.webmd.com/drugs (last visited on April 30, 2014). Ranitidine is also known as Zantac. Id. Simvastin is used to lower bad cholesterol and fats and raise good cholesterol. Id. Tramadol is also known as Ultram. Id.

[19] Lovastatin is used to lower bad cholesterol and fats and raise good cholesterol. WebMD, http://www.webmd.com/drugs (last visited on April 30, 2014).

[20] Percocet is used to relieve moderate to severe pain. WebMD, http://www.webmd.com/drugs (last visited on April 30, 2014). Magnesium citrate is a laxative used before surgery or other procedures. Id. Zofran is used to treat nausea and vomiting after surgery. Id. Dilaudid is used to relieve moderate to severe pain. Id.

lumbar spine revealed postoperative changes and mild spondylosis. CT scans of the abdomen revealed hydrosalpinx.[21] Chest X-rays revealed no abnormalities. (Tr. 783-95.)

On June 14, 2011, plaintiff reported sleeping and eating well and that she planned to move to Columbia, Missouri. Dr. Bhalla diagnosed alcohol and cannabis dependence in early remission and assessed a GAF score of 50.[22] (Tr. 1016-19.)

On July 1, 2011, plaintiff received an L4-L5 translaminar epidural steroid injection. (Tr. 978-79.)

On July 8, 2011, plaintiff reported that she obtained Medicaid coverage and reported that the epidural steroid injection alleviated her back pain. She further reported that she lived with her boyfriend, suffered physical and verbal abuse, but could not obtain other living arrangements. A foot examination revealed decreased sensation due to diabetic neuropathy. (Tr. 974-77.)

On July 27, 2011, plaintiff arrived at the emergency room, complaining of back spasms, left foot numbness, and the inability to raise her left foot. The impression of Rebekah Hudson, P.A., was chronic low back pain and left foot paresthesia and weakness. Lumbar X-rays revealed postoperative changes and mild degenerative change. (Tr. 947-54.)

On July 28, 2011, plaintiff complained of left foot weakness, numbness, and foot drop. She also complained of right ear pain. The differential diagnosis of Meghann Houck, M.D., for the left foot included stroke, diabetic neuropathy, and nerve compression. She referred plaintiff to physical and occupational therapy and further diagnosed right otitis externa. (Tr. 1081-84.)

On August 9, 2011, plaintiff complained of left foot drop and numbness and tingling. Dr. Kuhns observed decreased left foot sensation and mild neural foraminal stenosis at L3-4. He noted no evidence of nerve root compression but suggested peroneal nerve palsy. (Tr. 960-69.)

On August 16, 2011, plaintiff reported her pending application for disability benefits. Dr. Bhalla diagnosed alcohol and cannabis dependence and assessed a GAF score of 65[23]. (Tr. 1022-23.)

---

[21] Hydrosalpinx is the collection of serous fluid in the fallopian tube. Stedman at 913.

[22] A GAF score from 41 to 50 represents serious symptoms (such as thoughts of suicide, severe obsessional rituals, frequent shoplifting), or any serious impairment in social, occupational, or school functioning (such as the inability to make friends or keep a job). DSM at 32–34.

[23] On the GAF scale, a score from 61 to 70 represents mild symptoms (such as depressed mood and mild insomnia), or some difficulty in social, occupational, or school functioning (such as

On September 14, 2011, Patrick Finder performed a psychological evaluation on plaintiff. He noted that she arrived late, spoke extremely loudly throughout the interview, and laughed frequently. He observed mild obesity, use of a cane for walking and standing, and odd positioning of her left leg. He found maintaining her attention difficult. Plaintiff reported the following. Her father sexually abused her from age seven until at least age ten when she ran away. Until the age of seventeen, she lived in juvenile detention, group homes, foster homes, and psychiatric hospitals. A neighbor raped her at age thirteen, which rendered her unable to bear children. Her father also physically abused her. At age seventeen, the state released her from custody, and she went to work at a restaurant. Her first spouse abused her, and she subsequently remarried a man who died a few years later. She began using alcohol and drugs at a young age and used cocaine heavily in her twenties. She has six DWI convictions and spent six years in prison as a result. In 2006, after her release from prison, she worked at Tyson Foods and lived with an elderly couple that needed household assistance. She worked for three years until her back injury and never received worker's compensation. She also has chronic obstructive pulmonary disease and diabetes. The diabetic neuropathy causes left leg and foot numbness and impaired vision. She also receives treatment for bipolar disorder and has been hospitalized several times. She had previously abused substances but had remained sober since January. (Tr. 983-92.)

She reported that she lived with her boyfriend due to limited income. After she awakens, she checks the weather and a plant on her porch. She owns several cats. She recently lost a cat, and Dr. Finder observed that plaintiff appeared upset. She tries to keep a clean home and can wash dishes. She cannot stand for long and uses an office chair with wheels to cook. She also sits when she sweeps and launders. She cannot vacuum, clean the bathtub, or perform other activities that require prolonged bending. Neither she nor her boyfriend own a vehicle, but they live near a small grocery store. She enjoys socializing and shopping, though she requires an electric cart at large stores like Wal-Mart. At smaller stores, she can maneuver by leaning heavily on a traditional shopping cart. She can no longer ride horses, water ski, swim, attend football games and car races, or perform yard work. (Id.)

---

occasional truancy), but the individual generally functions well and has some meaningful interpersonal relationships. DSM at 32-24.

Dr. Finder observed that plaintiff cried nearly constantly throughout the interview and spoke through clenched teeth, which he assessed as tardive dyskinesia. She reported extreme depression but occasionally feels hyper and motivated. She also reported fluctuating sleeping patterns and a loss of concentration and focus. Additionally, she reported suicidal ideation and anxiety. She reported severe symptoms of posttraumatic stress, including flashbacks and nightmares, which are triggered by observing negative interactions with children, and she cannot tolerate people standing behind her. Dr. Finder noted that she struggled to maintain focus when he presented her with questions designed to test her math skills, common sense thinking, abstract thinking, and societal knowledge. He diagnosed bipolar I disorder, posttraumatic stress disorder, and polysubstance dependence in early, sustained remission. He considered delusional disorder and assessed a GAF score of 40.[24] He found that she had little to no ability to remember instructions, average intelligence, very little ability to sustain concentration and persistence with tasks, and paranoia of assault from strangers. (Id.)

On September 23, 2011, plaintiff complained of coughing, congestion, and wheezing. Dr. Hayes' impression was chronic obstructive pulmonary disease and allergic rhinitis. (Tr. 1085-88.)

On September 29, 2011, plaintiff complained of vaginal bleeding and low abdominal cramping. The impression of Jennifer A. Bickhaus, M.D., was menorrhagia, and she prescribed Sprintec.[25] (Tr. 1033-37.)

On September 30, 2011, plaintiff complained of poor mobility due to decreased strength and numbness of the left leg and foot. Electromyography revealed compression of the left peroneal nerve. Orthopedics found the condition to be chronic with no surgical resolution and recommended physical therapy. However, plaintiff could not obtain physical therapy due to lack of insurance coverage. She could walk only less than a half block and fell frequently. The impression of Christopher A. Brownsworth, M.D., was left common peroneal nerve compression

---

[24] A GAF of 31 through 40 means there is impairment in reality testing or communication (such as speech that is at times illogical, obscure or irrelevant), or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (such as depressed, avoids friends, neglects family, and is unable to work). DSM at 32–34.

[25] Sprintec is used to prevent pregnancy. WebMD, http://www.webmd.com/drugs (last visited on April 30, 2014).

and tinea versicolor. He recommended that plaintiff avoid crossing her legs and prescribed a wheel chair. (Tr. 1089-91.)

On October 3, 2011, plaintiff tearfully reported significantly decreased but continued vaginal bleeding. A pelvic ultrasound revealed a hemorrhaging ovarian cyst. Plaintiff requested a hysterectomy. (Tr. 1052-57.)

On October 4, 2011, Heather Murphy submitted a Physical Residual Capacity Assessment regarding plaintiff. She found that plaintiff could occasionally lift twenty pounds, frequently lift ten pounds, stand and walk for at least two hours in an eight-hour workday, and sit for about six hours. She further found that plaintiff could occasionally climb ramps and stairs, stoop, kneel, crouching, and crawl and never climb ladders, ropes, or scaffolds. Additionally, she found plaintiff limited in reaching in all directions, handling, and fingering. She indicated that plaintiff should avoid concentrated exposure to vibration, and fumes, odors, dusts, gases, and poor ventilation, and avoid even moderate exposure to hazards. (Tr. 30-35.)

Also on October 4, 2011, Barbara Markway, Ph.D., submitted a Psychiatric Review Technique form regarding plaintiff. She found that plaintiff had bipolar I disorder, posttraumatic stress disorder, and polysubstance dependence in early sustained remission. She further found that plaintiff had marked limitations with concentration, persistence, and pace and moderate limitations with daily living activities and social functioning. (Tr. 998-1009.)

On October 4, 2011, Dr. Markway also submitted a Mental Residual Functional Capacity Assessment regarding plaintiff. She found that plaintiff had moderate limitations with the ability to remember work procedures and locations and marked limitations with the ability to understand and remember detailed instructions. She further found that plaintiff had moderate limitations with the ability to maintain a schedule, the ability to sustain a routine without supervision, and the ability to work with others without distraction; and marked limitations with the ability to perform detailed instructions, the ability to maintain concentration, and the ability to complete a normal work schedule without unreasonable interruption due to psychological symptoms. Additionally, she found moderate limitations with the ability to interact appropriately with the public, supervisors, and coworkers; the ability to maintain socially appropriate behavior; the ability to respond to changes in the work setting; and the ability to plan independently. (Tr. 1010-12.)

On October 12, 2011, plaintiff reported anxiety and overwhelming stress. She further reported that she had not moved to Columbia due to finances and pending disability benefits application. Dr. Bhalla diagnosed alcohol and cannabis dependence and moderate, recurrent major depressive disorder and assessed a GAF score of 60. (Tr. 1024-27.)

On October 14, 2011, plaintiff complained of difficulty walking with her cane and multiple falls due to her impaired gait. She reported a decrease in her ability to bathe and prepare meals. Dr. Houck reported that treatment options for lower extremity nerve compression were limited and rarely effective. She recommended a splint and physical therapy. (Tr. 1092-93.)

On October 17, 2011, plaintiff underwent a preoperative examination regarding her scheduled hysterectomy. (Tr. 1058-64.)

On October 27, 2011, plaintiff underwent a total laparaoscopic hysterectomy. She tolerated the procedure well and arrived at the recovery room in good condition. (Tr. 1039-41.)

On November 18, 2011, plaintiff complained of urinating at a rate of three or four times per hour. Mary L. Smith, M.D., opined that the surgery and excessive thirst caused the frequent urination. She recommended that plaintiff drink less water before sleeping. (Tr. 1065-69.)

On December 14, 2011, plaintiff underwent a postoperative examination and reported that the frequent urination had resolved. She reported satisfaction with her recovery and had no complaints. (Tr. 1070-74.)

On December 15, 2011, plaintiff reported snoring, awaking, and gasping for air several times per night. She further reported pain on her left big toe that only rest and elevation relieved. Dr. Houck opined that sleep apnea caused plaintiff's low oxygen saturation and that a bunion caused the toe pain. She recommended a sleep study and an orthotic fitting with podiatry. (Tr. 1101-04.)

On December 19, 2011, plaintiff complained of sharp, radiating, intermittent left foot pain and reported that she could not walk long distances. Foot X-rays revealed mild hallux valgus deformity and a possible osteochondral lesion. Santaram Vallurupalli, M.D., noted that moving the left big toe caused extreme pain and recommended an MRI scan of the foot and electromyography. (Tr. 1126-29.)

On January 11, 2012, Dr. Bhalla diagnosed alcohol and cannabis dependence in early remission and recurrent, moderate major depressive disorder. He assessed a GAF score of 60 and prescribed Prozac, amitriptyline, and Ativan.[26] (Tr. 1028-31.)

On January 12, 2012, plaintiff complained of intermittent back pain. X-rays of the lumbar spine revealed solid fusion at L5-S1. Dr. Kuhns prescribed flexeril and tramadol. (Tr. 1132-33.)

On January 27, 2012, plaintiff complained that the back pain had increased in severity and radiated down her leg. She also reported incontinence and that she had scheduled foot surgery. Dr. Hayes assessed chronic back pain, sleep apnea, hallux valgus, chronic obstructive pulmonary disorder, allergic rhinitis, diabetes mellitus, anemia, and gastroesophageal reflux disease. (Tr. 1105-10.)

On January 30, 2012, plaintiff complained of continued left foot pain. The MRI scans and electromyography revealed no abnormalities. Michael Wesley Robertson, M.D., assessed a bunion and scheduled a bunionectomy. (Tr. 1134-36.)

On February 2, 2012, plaintiff underwent a McBride procedure and osteotomy on her left big toe. Following the surgery, Dr. Robertson provided plaintiff with a leg splint. (Tr. 1113-15.)

On February 7, 2012, Dr. Robertson instructed plaintiff on home exercises for her toe and placed her in a cast. Plaintiff reported a court appointment scheduled the next day and suggested that the court appointment could result in 120 days of incarceration. (Tr. 1138-39.)

**First ALJ Hearing**

The ALJ conducted a hearing on June 11, 2010. (Tr. 58-90.) He observed that she clutched her lower stomach throughout the proceeding. Plaintiff testified to the following. She is age 41 and has obtained her GED. She last worked for Tyson on May 1, 2009. She worked for Tyson for nearly three years as a forklift operator. Her job also required some manual lifting. She injured her back by lifting an 86-pound box of meat. (Tr. 63-66.)

The back injury caused her difficulty with sitting and standing. She can stand for only ten minutes continuously before sharp pains shoot through her hips and to her legs. Ice packs and lying with a pillow between her legs alleviates the pain. She spends about half the day lying

---

[26] Ativan is used to treat anxiety. WebMD, http://www.webmd.com/drugs (last visited on April 30, 2014).

down due to the pain in her hip and abdomen.  Her surgery one month earlier did not improve her symptoms.  She can sit for only ten minutes continuously.  (Tr. 67-68.)

She has received treatment for bipolar disorder.  She also experiences racing thoughts, which her financial and medical issues exacerbates.  Reading a newspaper requires three or four attempts.  Her thoughts also impair her sleep and cause extreme emotion.  She sleeps two to four hours per night, which results in edginess and fatigue.  She cries almost daily in spells that last from thirty minutes to two hours.  She currently receives psychological treatment at the Arthur Center with Dr. Bhalla and takes medication for depression and anxiety.  (Tr. 68-71.)

She lives in an apartment with a male friend.  She applied for Section 8 housing.  She cannot vacuum.  She must sit in a chair to wash dishes.  She uses a device to dress herself.  Her recent back surgery was successful, but her stomach incision did not heal well.  The plates in her back remain in place according to the X-rays.  She scheduled a full hysterectomy.  Her back pain has not improved since her surgery, although her surgeon instructed her that pain relief would take time.  She cannot drive and relies on friends and Medicaid for transportation.  (Tr. 72-75.)

On a typical day, she applies ice packs, takes medicine, and tries to relax due to stiffness and soreness.  At the time of the hearing, her stomach incision caused her the greatest amount of pain.  She also has diabetes.  Her vision has worsened, and she needs glasses to read.  She also has asthma, which Advair controls.  She has quit smoking, and she rarely uses an albuterol inhaler.  (Tr. 76-78.)

She injured her left hand at age eighteen during her work at a bar and grill.  She cut her middle finger through the tendon, which required the placement of wire.  She cannot feel through her middle finger, and cold causes her fingers to ache.  She broke her left foot at age 24, which required a cast but no surgery.

Vocational Expert (VE) Herman Litt also testified at the hearing.  Plaintiff's past relevant work included work as a forklift operator, which is medium, semi-skilled work.  The ALJ presented a hypothetical individual of plaintiff's age, education, and work experience, who could perform light work, except that she could not climb ladders, ropes, or scaffolds; could only occasionally climb stairs and ramps, stoop, and crawl; and could only occasionally tolerate extreme cold and dusts, fumes, and gases.  Further, such individual could understand, remember, and perform simple instructions, perform routine, repetitive tasks, make only simple decisions,

and tolerate very few workplace changes. The VE responded that such individual could perform work as a ticket seller, which is light, unskilled work with 185,000 positions nationally and 1,000 positions in Missouri; small products assembler, which is light, unskilled work with 205,000 positions nationally and 1,100 positions in Missouri; and office helper, which is light, unskilled work with 190,000 positions nationally and 1,000 positions in Missouri.

The ALJ altered the hypothetical individual by limiting the individual to sedentary work. The VE responded that such individual could perform work as an optical goods worker, which is sedentary, unskilled work with 135,000 positions nationally and 800 positions in Missouri; jewelry preparer, which is sedentary, unskilled work with 130,000 positions nationally and 700 positions in Missouri; and sorter, which is sedentary, unskilled work with 135,000 positions nationally and 900 positions in Missouri. The VE also testified that failing to arrive at work for three or more days per month, failing to maintain concentration for more than ten percent of the day, or requiring two or three additional rest breaks per day would preclude employment.

**First Decision of the ALJ**

On July 26, 2010, the ALJ issued a decision that plaintiff was not disabled. (Tr. 133-45.) However, on December 12, 2011, the Appeals Council remanded the case to the ALJ, finding the record unclear "as to the claimant's maximum mental residual functional capacity and the impact of the claimant's assessed limitations on her remaining occupations base and that further development is necessary." (Tr. 153-55.) Additionally, the Appeals Council noted plaintiff's award of disability benefits for the period beginning May 23, 2011. (Id.)

**Second ALJ Hearing**

Following the remand, a different ALJ conducted a hearing on May 8, 2012. (Tr. 91-127.) Plaintiff testified to the following. She measures five feet, three inches, and 185 pounds. Her medication causes her to gain weight. She is widowed and lives in a one-story house with her significant other. She receives $98 in food stamps per month and disability benefits. She does not have a driver's license and relies on her significant other and friends for transportation. Her significant other drove her 53 miles to the hearing. She needed a restroom break on the way. She completed the tenth grade and obtained her GED in 2002. She underwent foot surgery on

February 2 to remove a bunion and to reroute a nerve, and occasionally feeling returns to her foot. (Tr. 96-100.)

In June 2009, Tyson terminated her employment as a forklift operator. Her job required stacking boxes of meat that weighed up to 86 pounds. She ruptured her back by lifting a box. In 1999 to 2006, she was incarcerated. She also worked at Shoney's where she supervised up to ten employees and prepared work schedules. (Tr. 100-01.)

After her termination from Tyson, her mental stability prevented her from working. She cried frequently, felt incapable of independent functioning and inadequate, and her physical impairments caused her relationship to fail. She received mental health treatment from 2009 to 2011. She overdosed on sleeping medicine on September 2, 2010. She could no longer visit Dr. Perez, a psychiatrist, after her insurance coverage lapsed following her termination from Tyson. She could not find cheaper care in part because she had no driver license and her family resides in the Kansas City area. During this time, she took Prozac and hydroxyzine through the health department. After she obtained Medicaid coverage, she began seeing Dr. Bhalla for mental health treatment. She attempted suicide due to feelings of purposelessness. Afterwards, she went to the hospital and used a ventilator for four days. The court ordered her to attend a program for treatment and therapy, where she spent four or five days. Dr. Bhalla increased her dosage of Prozac and lorazepam, which stabilized her. (Tr. 102-06.)

Also on September 2, 2010, drug screening revealed use of opiates and marijuana. She has been sober since October 22, 2010. She underwent spinal fusion surgery on May 12, 2010. She experiences pain on her left side, which began after the surgery. In January 2011, she was involved in a physical altercation and slip-and-fall while she was incarcerated at the Montgomery County Jail for a DUI. She has prescriptions for a cane and a wheelchair. She stopped smoking in 2010. She has asthma and uses inhalers, nebulizers, and Advair. She attended both inpatient and outpatient programs for drug and alcohol rehabilitation. (Tr. 107-12.)

She experiences back pain that radiates to her left side down her left leg to her knee. She uses pain patches for her back. She injured her back on December 26, 2008. The pain prevents her from tying her shoes, bending, or squatting. Icing her low back relieves her pain. She cannot sit or lay. She lays in bed most of the time but is never comfortable. Her back causes her difficulty with making sandwiches, bathing, and showering. Her significant other assists her. She

also has a friend assist her with household chores.  Her significant other shops for groceries while she remains at home.  (Tr. 112-15.)

She spends many of her days crying uncontrollably.  Her health condition causes tension in the relationship with her significant other, and they sought counseling from a minister.  She stayed at a battered women's shelter.  She remains with her significant other and has resolved some of the issues.  She often could not tolerate the presence of others due to her emotion.  She has been convicted for driving while intoxicated several times.  She struggles with remaining on task and has racing thoughts.  During her inpatient drug rehabilitation, she cried and screamed in anger regularly.  She also has drop foot, which causes stumbling.  She was laid for up to half the day, and she suffered depression.  (Tr. 116-22.)

VE Steven Kuhn also testified at the hearing.  The VE testified that her past relevant work included work as a forklift operator, which is medium, semi-skilled work; and as a server, which is light, semi-skilled work.  The ALJ presented a hypothetical individual with plaintiff's age, education, and work experience, who could perform only light work, could only occasionally lift twenty pounds, could frequently lift ten pounds, could stand and walk for only six hours in an eight-hour workday and sit for only six hours, could only occasionally climb ramps and stairs, and could never climb ladders, ropes, or scaffolds.  Further, the individual could interact with coworkers, supervisors, and the public only occasionally; adapt to routine change, and understand and remember simple instructions; but could not perform work with a fast-paced production requirement.  (Tr. 122-24.)

The VE replied that such an individual could not perform plaintiff's past relevant work.  However, such individual could perform as a cafeteria attendant, which is light, unskilled work with 60,000 positions nationally and 2,000 positions regionally; as a cleaner, which is light, unskilled work with 350,000 positions nationally and 14,000 positions regionally; and as an office clerk, which is light, unskilled work with 200,000 positions nationally and 7,000 positions regionally.  The VE's definition of "regionally" included the states of Missouri, Kansas, Iowa, and Nebraska.  (Tr. 124-25.)

The ALJ presented a second hypothetical individual that could perform sedentary work, could stand and walk only two hours in an eight-hour workday, sit for six hours, maintain a normal work pace for less than four hours per day, could have no contact with coworkers,

supervisors, or the public, and who would require three additional breaks per day for emotional difficulties or rest. The VE responded that such individual could perform no work. (Tr. 125-26.)

Counsel for plaintiff also presented a hypothetical individual that could not focus on tasks for more than a few minutes, had regular crying spells, and needed to recline for half the day. The VE responded that such individual could perform no work. (Tr. 126.)

### III. DECISION OF THE ALJ

On June 8, 2012, the ALJ issued a decision that plaintiff was not disabled after August 20, 2009. (Tr. 9-21.) At Step One of the prescribed regulatory decision-making scheme,[27] the ALJ found that plaintiff had not engaged in substantial gainful activity since the alleged onset date, June 1, 2009. At Step Two, the ALJ found that plaintiff had the severe impairments of degenerative disc disease, obesity, bipolar disorder, and depression. (Tr. 12.)

At Step Three, the ALJ found that plaintiff had no impairment or combination of impairments that met or was the medical equivalent of an impairment on the Commissioner's list of presumptively disabling impairments. (Id.)

The ALJ considered the record and found that plaintiff had the residual functional capacity (RFC) to perform light work and that she could lift twenty pounds occasionally, lift ten pounds frequently, stand and walk for six hours in an eight-hour workday, sit for six hours, could occasionally climb ramps and stairs, stoop, and crawl, but could never climb ladders, ropes, or scaffolds. She further found that plaintiff could occasionally interact with coworkers, supervisors, and the public; could understand and remember simple instructions and adapt to routine change; but could not perform work with a fast-paced production requirement. At Step Four, the ALJ found plaintiff capable of performing no past relevant work. (Tr. 14.)

At Step Five, the ALJ found plaintiff capable of performing jobs existing in significant numbers in the national economy. (Tr. 412.)

### IV.  GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and are

---

[27] See below for explanation.

supported by substantial evidence in the record as a whole.  <u>Pate-Fires v. Astrue</u>, 564 F.3d 935, 942 (8th Cir. 2009).  "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion."  <u>Id.</u>  In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision.  <u>Id.</u>  As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently.  <u>See</u> <u>Krogmeier v. Barnhart</u>, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months.  42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A); <u>Pate-Fires</u>, 564 F.3d at 942.  A five-step regulatory framework is used to determine whether an individual is disabled.  20 C.F.R. § 416.920(a)(4); <u>see also</u> <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140-42 (1987) (describing the five-step process); <u>Pate-Fires</u>, 564 F.3d at 942 (same).

Steps One through Three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment.  20 C.F.R. § 416.920(a)(4)(i)-(iii).  If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five.  Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform past relevant work (PRW).  <u>Id.</u> § 416.920(a)(4)(iv).  The claimant bears the burden of demonstrating she is no longer able to return to her PRW.  <u>Pate-Fires</u>, 564 F.3d at 942.  If the Commissioner determines the claimant cannot return to PRW, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work that exists in significant numbers in the national economy.  <u>Id.</u>; 20 C.F.R. § 416.920(a)(4)(v).


## V.  DISCUSSION

Plaintiff argues that the ALJ erred by (1) finding plaintiff not credible due to her daily activities and (2) the ALJ improperly considered the opinion of Dr. Finder and failed to consider

the opinion of Dr. Altomari and the treatment notes from the Family Counseling Center of Missouri.

## A. Credibility

Plaintiff argues that the ALJ erroneously discounted plaintiff's allegations by considering her daily activities and by stating "The claimant underwent a L5-S1 anterior interbody fusion, with minimally invasive posterior spinal fusion in May 2010."

To evaluate a claimant's subjective complaints, the ALJ must consider the <u>Polaski</u> factors: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the condition; (3) dosage, effectiveness, and side effects of medication; (4) precipitating and aggravating factors; and (5) functional restrictions." <u>Wildman v. Astrue</u>, 596 F.3d 959, 968 (8th Cir. 2010). The ALJ may also consider inconsistencies in the record as a whole. <u>Id.</u> "[Courts] defer to an ALJ's credibility finding as long as the ALJ explicitly discredits a claimant's testimony and gives a good reason for doing so." <u>Id.</u>

Plaintiff alleges that the ALJ erroneously discounted her allegations of disabling back pain by stating, "The claimant underwent a L5-S1 anterior interbody fusion, with minimally invasive posterior spinal fusion in May 2010." Regarding plaintiff's allegations of disabling back pain, the ALJ found the alleged severity of plaintiff's back pain to be inconsistent with the medical record. The ALJ considered the 2009 MRI and discogram scans that revealed mild degeneration of the lumbar spine and an acute annular tear at L3-L5 in addition to the nerve conduction study that revealed no abnormalities. (Tr. 567-72, 583-87.) She also considered plaintiff's May 2010 surgical procedure, which involved an L5-S1 anterior lumbar interbody fusion with unilateral, minimally invasive posterior spinal fusion. (Tr. 679-86.) She further considered plaintiff's postoperative treatment records, including the X-rays and CT scans that revealed no complications with the procedure. (Tr. 772-95, 819-26, 844, 884-85, 888, 896-97.)

Plaintiff's argument focuses on the word "minimally," and she describes the surgery as a "major surgery consistent with considerable pain." However, the ALJ's language merely mirrors the description of the surgical procedure in the medical record. (Tr. 15, 677.) The ALJ did not emphasize the minimal invasiveness of the surgery but rather the radiographic evidence that followed the procedure, which indicated no signs of deterioration and that the surgical hardware

remained in place. (Tr. 15-16.) Specifically, the ALJ stated, "These 'mild' findings appear disproportional to the amount of pain alleged during the relevant period." (Id.) Accordingly, plaintiff's argument regarding the ALJ's statement concerning the surgical procedure is without merit.

Plaintiff also argues that the ALJ improperly discounted her allegations by relying on plaintiff's statements that she cared for her pets, shopped for groceries, maintained relationships, performed chores, and enjoyed hobbies, including sewing, dancing, and riding horses. The ALJ must consider such activities to evaluate a claimant's credibility. Wildman v. Astrue, 596 F.3d 959, 968 (8th Cir. 2010). However, the Eighth Circuit "has repeatedly stated that a person's ability to engage in personal activities such as cooking, cleaning or a hobby does not constitute substantial evidence that he or she has the functional capacity to engage in substantial gainful activity." Singh v. Apfel, 222 F.3d 448, 453 (8th Cir. 2000).

Here, the ALJ did not rely on plaintiff's daily activities alone. The ALJ relied on the evidence regarding the spinal fusion as set forth above. The ALJ also relied on the observations of medical personnel describing plaintiff's behavior as histrionic. (Tr. 491, 589-90, 829-31.) Further, the ALJ noted plaintiff's history of drug abuse and her requests for pain medication. See Anderson v. Barnhart, 344 F.3d 809, 815 (8th Cir. 2003) (noting that the ALJ may discount allegations of pain due to drug-seeking behavior); Anderson v. Shalala, 51 F.3d 777, 780 (8th Cir. 1995) (same). Accordingly, the ALJ did not err by considering plaintiff's daily activities.

Plaintiff further argues that the ALJ failed to consider the observations of third parties. The ALJ must consider the observations of third parties. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). Plaintiff's boyfriend submitted the only two third-party function reports in the record. (Tr. 367-77, 429-41.) The ALJ considered the third-party function reports but found the reports inconsistent with the medical record. (Tr. 19.) Accordingly, plaintiff's allegation that the ALJ did not consider the observations of third parties is without merit.

Additionally, plaintiff argues that the ALJ misinterpreted her statements regarding her hobbies. Specifically, on plaintiff's function report, she listed her hobbies and interests as sewing, dancing, horse riding, and outdoor sports. (Tr. 347.) However, she then immediately states twice that she could not perform activities as she once could. (Id.) Although the ALJ may

have erroneously interpreted plaintiff's function report, substantial evidence nevertheless supports the ALJ's credibility determination regarding plaintiff.

## B. Medical evidence

Plaintiff argues that the ALJ improperly considered the opinions of Dr. Altomari and failed to consider the opinion of Dr. Finder and plaintiff's treatment notes from the Family Counseling Center of Missouri.

Plaintiff argues that the ALJ erroneously found that Dr. Altomari had determined that she could perform complex instructions. However, the ALJ's finding mirrors the language of Dr. Altomari's report. (Tr. 654.) Plaintiff also notes that the ALJ discounted Dr. Peaco's opinion for his failure to define the term "moderate" and that Dr. Altomari also did not define such terms. However, from Dr. Altomari's opinion, the ALJ relied solely on narrative discussion that did not include the term "moderate." (Tr. 19, 164.)

Plaintiff further argues that the ALJ improperly relied on Dr. Altomari's opinion, because Dr. Altomari did not treat or examine plaintiff. "The opinions of non-treating practitioners who have attempted to evaluate the claimant without examination do not normally constitute substantial evidence on the record as a whole." Shontos v. Barnhart, 328 F.3d 418, 427 (8th Cir. 2003). However, the ALJ did not rely solely on the opinion of Dr. Altomari to formulate her RFC determination. Rather, she afforded more weight to the opinion based on its consistency with the record at the time of its submission but also noted that records subsequent to the opinion revealed additional limitations. (Tr. 19.)

Plaintiff argues that the ALJ failed to consider her treatment at the Family Counseling Center of Missouri. However, the ALJ cited these treatment records several times throughout her explanation of the RFC determination. (Tr. 17-18.)

Plaintiff argues that the ALJ failed to consider the opinion of Dr. Finder. "An ALJ's failure to consider or discuss a treating physician's opinion that a claimant is disabled constitutes error where, as here, the record contains no contradictory medical opinion." Prince v. Bowen, 894 F.2d 283, 285-86 (8th Cir. 1990). Although the ALJ did not discuss Dr. Finder's opinion, Dr. Finder did not treat plaintiff but examined her on only one occasion. (Tr. 983.) Moreover, "[a]lthough required to develop the record fully and fairly, an ALJ is not required to discuss every

piece of evidence submitted." <u>Black v. Apfel</u>, 143 F.3d 383, 386 (8th Cir. 1998). Additionally, "[a]n ALJ's failure to cite specific evidence does not indicate that such evidence was not considered." <u>Id.</u> The court also notes that Dr. Finder's examination took place four months after the period at issue: June 1, 2009 to May 23, 2011. (Tr. 983.) Moreover, mental examinations performed during the relevant time period found her impairments less severe. (Tr. 616-18, 640-54.) Additionally, Dr. Finder based his opinion solely on his interview with plaintiff. (Tr. 984.)

Accordingly, plaintiff has failed to demonstrate that the ALJ improperly considered the opinions of Dr. Altomari and Dr. Finder and the treatment records from the Family Counseling Center of Missouri.

## VI. CONCLUSION

For the reasons set forth above, the decision of the Commissioner of Social Security is affirmed. An appropriate Judgment Order is issued herewith.

_____/S/   David D. Noce_____
**UNITED STATES MAGISTRATE JUDGE**

Signed on June 20, 2014.